**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH JONES | ) | |
| *Plaintiff*, | ) | No. 24 C 6138 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| CITY OF EVANSTON | ) | |
| *Defendant*, | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Sarah Jones sued Defendant City of Evanston for race discrimination. (Dkt. 15). The City moves for summary judgment. (Dkt. 55). For the reasons below, the Court denies the City's Motion in full except as to Counts II and III to the extent Jones seeks to bring her claims under Section 1981. (*Id.*) The Court denies Jones' Motion for Limited Admission (Dkt. 78) and the City's Motion For Leave To File Response To Plaintiff's Rule 56.1(B)(3) Statement Of Facts *Instanter*. (Dkt. 85).

**BACKGROUND**

Jones is a white woman who started working for the Evanston Police Department in 2005, eventually reaching the rank of supervisor in the records department. (Dkt. 51, ¶¶ 1, 7-9; Dkt. 62, ¶¶ 1, 7-9). During the time when Jones was the supervisor, she supervised four employees in the records department: Tarshanda Shorty and Laila Green (both of whom are Black women) and Maribel Rivera and Catalina Delarosa (both of whom are Latina women). (Dkt. 51, ¶¶ 7-11, 13-15; Dkt. 62, ¶¶ 7-11, 13-15).[1]

[1] Green was a part-time employee while the rest were full-time employees.

The City's story is that "Jones was terminated from her employment with the City of Evanston Police Department in March of 2024 after a thorough investigation found that she violated multiple rules and engaged in misconduct." (Dkt. 55 at 1) (citing Dkt. 51, ¶¶ 45-47, 53, 57). The City asserts that its "investigation demonstrated that Jones had not only engaged in favoritism" and "lacked the interpersonal skills necessary to manage the Records Bureau, but that she had also misused her position." (*Id.*) (citing Dkt. 51, ¶¶ 45-48). The City continues that Jones' "misconduct went so far as putting the entire Department at risk by putting their use of the LEADS system at risk based on her improper use and her failure to follow chain of command prior to disclosing sensitive law enforcement information." (*Id.*) (citing Dkt. 51 ¶¶, 50-51, 53-54).[2]

In Jones' view, she was terminated because of an alleged "policy where supervisors are not to discipline or give negative feedback to employees whose race is Black." (Dkt. 15, ¶ 15); (Dkts. 60, 62). Jones claims that the dispute here arose from a conflict between her and Tarshanda Shorty. (Dkts. 60, 62). Jones contends that she "reported ongoing misconduct by Shorty, including insubordination, poor performance, and hostile behavior, and she further reported that Deputy Chief Sacluti refused to supervise Shorty or support [Jones] in addressing these issues." (Dkt. 60 at 23). Jones continues that, "[a]fter [she] complained about Shorty, [the City] did not investigate Shorty's conduct, her performance deficiencies, or her repeated insubordination and mistakes." (*Id.* at 24). "Instead, [the City] prompted Shorty to file a complaint against [Jones]—telling Shorty that [Jones] 'wanted to discipline her,' and then immediately opened an investigation into" Jones. (*Id.*) Jones argues that the investigation was a post-hoc sham designed as cover to fire Jones. (*See, e.g.*, *id.* at 5, 6, 9, 10, 18, 27). Jones takes issue with each basis the City raised as justification for her firing, pointing out that, prior to the issues with Shorty, Jones received positive reviews,

[2] "LEADS" is the Law Enforcement Agencies Data System.

complied with policies, including those concerning the LEADs system and chain of command, and was an exemplar employee. (*See, e.g.*, *id.* at 11, 18, 19, 22, 23, 27, 28).

Jones filed this employment discrimination lawsuit a few months after the City terminated her. Jones asserts six causes of action stemming from the City's alleged conduct, including three counts for race discrimination—in violation of Title VII (42 USC § 2000e-2(a)(1)) (Count I), 42 U.S.C. § 1983 (Count II), and the Illinois Human Rights Act ("IHRA") (775 ILCS 5/2-102(A)) (Count IV) —and three counts for retaliation—in violation of Title VII (42 U.S.C. § 2000e-3(a)) (Count V), 42 U.S.C. § 1983 (Count III), and the IHRA (775 ILCS 5/6-101(A)) (Count VI). (Dkt. 15, ¶¶ 105-144).[3] The City moves for summary judgment on all counts. (Dkt. 55).

**LEGAL STANDARD**

"Summary judgment is appropriate when the moving party shows 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Giovannelli v. Walmart Inc.*, 164 F.4th 1052, 1054 (7th Cir. 2026) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *Anderson*, 477 U.S. at 248. The movant "bears the burden of showing that summary judgment is appropriate" and that these requirements have been met. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). A "movant may prevail at summary judgment by showing an absence of evidence to support the non-movant's claims." *Upchurch v. Indiana*, 146 F.4th 579, 586 (7th Cir. 2025); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). To overcome a motion for summary judgment, the "nonmoving party must provide specific material facts showing there is a genuine

[3] Jones has two "Count V." (Dkt. 15, ¶¶ 132-144). To avoid confusion, the Court refers to Jones' second Count V (for retaliation under the IHRA) as Count VI. (*Id.*, ¶¶ 139-144).

issue for trial." *Tech. Sec. Integration, Inc. v. EPI Techs., Inc.*, 126 F.4th 557, 560 (7th Cir. 2025); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party who fails to produce evidence sufficient to show an element essential to his case on which he bears the burden cannot survive a summary judgment motion." *Gills v. Hamilton*, 164 F.4th 640, 644 (7th Cir. 2026).

## DISCUSSION

### I. Motion to Strike

In its Reply, the City moves to strike Jones' Rule 56.1(b)(3) Statement of Additional Facts. (Dkt. 75); (Dkt. 66). The City does not state which rule they are moving under, but it is presumably under Rule 12(f). (*Id.*) The City asserts that Jones' Statement of Facts "drastically exceed[s] the reasonable limits of length and content and [is] organized in such a way that render[s] the City's response impractical and unduly burdensome." (*Id.* at 2). It notes that there are "numerous facts asserted which are vague, conclusory, hearsay, and otherwise not supported by admissible evidence under Federal Rule 56." (*Id.* at 2-3). The City did not file a Reply to Jones' Statement of Facts under Local Rule 56.1(c)(2); it instead moved to strike and responded to Jones' legal arguments. (*See* Dkts. 66, 75).

Over three months later, Jones filed a Motion—without leave of Court—for the Court to deem admitted her Statement of Additional Material Facts. (Dkt. 78) ("Motion to Admit"). She also filed a Response in Opposition to the City's Motion to Strike, again without leave of Court. (Dkt. 79). The Court Ordered the City to respond within one week. (Dkt. 81). The City complied. (Dkt. 84). The City also filed a Motion for Leave to File a Response to Plaintiff's Rule 56.1(b)(3) Statement of Facts *Instanter*. (Dkt. 85) ("Motion to Respond *Instanter*"). Attached to which, the

City provided statement-by-statement responses and objections to Jones' Statement of Additional Facts. (Dkt. 85-1). Jones filed a response to the City's Motion to Respond *Instanter*. (Dkt. 87).

The Court "requires strict compliance" with the Local Rules. *See* Chief Judge Kendall Standing Order – Summary Judgment Motions ("CJK Standing Order"). "Motions to strike all or portions of an opposing party's LR 56.1 submission are disfavored." L.R. 56.1(e)(2). "If a party contends that its opponent has included objectionable or immaterial evidence or argument in a LR 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief." *Id.* "In the event that the objection is overruled, the failure to admit or dispute an asserted fact may constitute a waiver." *Id.* "Failure to abide by the Local Rules may result in the Court striking briefs, disregarding statements of fact, deeming statements of fact admitted, or denying summary judgment." *See* CJK Standing Order.

By failing to file a response to Jones' Statement of Facts, the City violated Local Rule 56.1(c)(2) which states that, "[a]fter an opposing party files its materials under LR 56.1(b), the movant shall serve and file . . . a response to the LR 56.1(b)(3) statement of additional material facts . . . that complies with LR 56.1(e)[.]" Absent explicit indication to the contrary, the word "shall" "imposes a nondiscretionary duty." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 362 (2018); *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.") (quotes omitted). Since the Court requires "strict" compliance with the Local Rules, there is no room for discretion here—the City was required to file a Local Rule 56.1(c)(2) response to Jones' Statement of Facts, not a motion to strike. L.R. 56.1(c)(2).

By moving to strike instead of presenting competing evidence as the Local Rules require, the City bet big and took a calculated risk. If granted, the City's prospects of success would have

improved exponentially; if denied, failure is all but certain. The bet did not pay off. Subject to a few exceptions discussed below, the Court denies the City's Motion to Strike. (Dkt. 75). "This results in all facts being deemed admitted." *Walker v. Costco Wholesale Corp.*,___F.Supp.3d___, 2026 WL 1045613, at *3 n.1 (N.D. Ill. Apr. 17, 2026) (ruling that movant's failure to respond to non-movant's statement of facts results in all facts being deemed admitted given that the "Court requires 'strict' compliance with its rules and procedures") (citing *McMahan v. Deutsche Bank AG*, 892 F.3d 926, 929 n.2 (7th Cir. 2018) ("We have consistently held that a failure to respond . . . as mandated by the local rules results in an admission.") (quotes omitted)); *McCurry v. Kenco Logistics Servs.*, LLC, 942 F.3d 783, 787 (7th Cir. 2019) (affirming finding facts admitted when party failed to properly respond); *Sentinel Ins. Co., Ltd. v. Majestic Auto Glass Inc.*, 2026 WL 663820, at *3 (N.D. Ill. Mar. 10, 2026) (statement of facts deemed admitted when party failed to respond); *Duran v. Chief Judge of Cir. Ct. of Cook Cnty.*, 2026 WL 663405, at *2 (N.D. Ill. Mar. 10, 2026) (same); L.R. 56.1(e)(2) ("In the event that the objection is overruled, the failure to admit or dispute an asserted fact may constitute a waiver."); CJK Standing Order ("Failure to abide by the Local Rules may result in the Court striking briefs, disregarding statements of fact, deeming statements of fact admitted, or denying summary judgment.").

Normally the City's violation of the Local Rules and failure to respond would quickly dispense with its Motion. *Id.* The situation is confounded by Jones' own Local Rule violations. (*See* Dkt. 66). Not all of Jones' statements comport with the Local Rules; and several of Jones' statements are hardly "concise." L.R. 56.1(d)(1); (Dkt. 66). Certain "statements" span multiple pages. (Dkt. 66). While each statement has citations in support, at times the utility of these citations is undermined because—instead of providing a citation after each sentence—Jones lists all evidentiary support in a string cite at the end of the statement. (*Id.*); L.R. 56.1(d)(2). For those

statements (or subparts) that are concise, this poses no problem. (*See e.g.*, *id.*, ¶¶ 41, 42). For others, however, the length of the statements makes it difficult for the Court to connect each asserted fact within the statement to the evidence cited pages below. (*See, e.g.*, *id.*, ¶¶ 33-34). The Court notes that often, however, the lengthier statements merely regurgitate the content of the cited material, and thus, while verbose and unnecessary, the violations are a nuisance but largely harmless.

The issue with what to do with the City's Motion to Strike and Jones' Statement of Facts is further complicated for additional reasons. The first is that Jones moved for leave to file her Statement of Facts in excess of 40 numbered paragraphs and attached to that motion a "draft" version that was represented to be "substantially similar" to the final version Jones intended to file. (Dkt. 61 at 2, 4-45, ¶ 7). Critically, the City—despite seeing Jones' draft—took "no position and [did] not object[.]" (*Id.*, ¶ 4). That the City, now presented with what is indeed a "substantially similar" version of Jones' initial "draft," cries foul and moves to strike for a litany of reasons is unpersuasive. At the same time, while the Court granted Jones' motion for leave to exceed 40 numbered paragraphs, that was not a seal of approval of Jones' then "draft" which, now in its final form, finds itself in tension with Local Rule 56.1. Jones has 42 paragraphs, but the actual number of statements is anyone's guess—certainly well over 110. (*See* Dkt. 66). Many of Jones' statements are prolix, verbose, and should have been organized more coherently. (*See, e.g.*, *id.*, ¶¶ 6, 33 (prolix and verbose), ¶ 18 (confusingly organized)). While long-winded and redundant at times, the Court is able to demarcate Jones' admissible statements and evidence from her impermissible unsupported statements (e.g., usually the variety of statements that preceded her listed evidence in

each statement which, the Court declines to consider). To Jones' credit, each of her statements are supported (and in many cases amply so), but the organization and cohesion is wanting.[4]

While the City complains that responding to Jones' Statement of Facts would be "impractical and unduly burdensome," the Court does not agree. (Dkt. 75 at 2). First off, this is not a large case. The issues are discrete. The volume of materials is nominal. The City has no basis to willfully violate the rules merely because it does not want to put in the work. There is no Local Rule that permits a party to decline to respond to a statement of facts because they claim it is too "burdensome." The Court granted ***both*** of the City's motions for extension of time and the City's motion to file an oversized reply brief—giving the City 37 days and 36 pages to file their response. (Dkts. 67-77). The City's positions are further belied because many of Jones' statements are clearly proper—and indistinguishable in scope and support from the City's own asserted facts. (*See e.g.*, Dkt. 66, ¶¶ 3, 11, 16, 19, 25-28, 31, 32, 35, 41, 42).[5] There is no reason the City could not have properly responded to these statements. The City's arguments that it would have been too burdensome to follow the rules and provide substantiated objections and responses to each of Jones' statements are further undermined by its Motion to Respond *Instanter*, which, in many respects, does just that—yet on one week's notice. (Dkt. 85).

The Court does not disregard that Jones' organization is wanting, and the way she structured her Statement of Additional Facts can be cumbersome. Nor does it overlook that certain statements violate the Local Rules in length. (Dkt. 66, ¶¶ 6, 9, 17, 21, 30, 33, 34, 36). But two wrongs do not make a right. The City could have complied with the lion's share of Jones' statements; and, for those that are excessively lengthy, the City should have objected, provided

[4] The City's Statement of Facts suffers from many of the same issues including statements with subparts (Dkt. 51, ¶ 46) and verbose statements. (*See, e.g.*, *id.*, ¶¶ 22, 24, 52).
[5] While the City complains about Jones' use of subparts, many of the subparts are indisputably concise. (*See, e.g.*, Dkt. 66, ¶ 31(a)-(t)).

competing evidence to what Jones presented, and then moved the Court to disregard all of Jones' unsupported statements and bare attorney argument. The City did none of that. They instead rolled the dice hoping for a big win, leaving themselves utterly exposed should denial come. It has.

The Court therefore denies the City's Motion to Strike. (Dkt. 75); L.R. 56.1(c)(2), (e)(2); CJK Standing Order. The Court further denies Jones' Motion to Admit and the City's Motion to Respond *Instanter*. (Dkts. 78, 85). Both of these motions are wholly untimely. (Dkt. 50). Neither party even attempts to show excusable neglect for their delay. Fed. R. Civ. P. 6(b)(1)(B). And both are mooted and foreclosed by the Local Rules. L.R. 56.1(c)(2), (e)(2); CJK Standing Order.

The City is deemed to have admitted every statement in full unless otherwise noted. L.R. 56.1(e)(2); CJK Standing Order. That said, the Court will still only consider Jones' statements that comply with the Local Rules and that are admissible at trial. *See Little v. JB Pritzker for Governor*, 2021 WL 3666429, at *1-4 (N.D. Ill. Aug. 18, 2021) (applying same framework when facing significant Local Rule 56.1 violations); *see also Ross v. UChicago Argonne, LLC*, 2023 WL 2745678, at *3 (N.D. Ill. Mar. 31, 2023) ("While the Court could . . . strike Plaintiff's Response . . . because of the serious deficiencies and violations of Local Rule 56.1 . . . the Court will not do so *en masse.* Instead, the Court will accept those of Plaintiff's proffered factual statements that comply with Local Rule 56.1 and ignore those that do not. The extent to which the Court has accepted or rejected Plaintiff's proffered facts will be clear in the Court's recitation of the relevant material facts below and its application of the law to those facts."); *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020) ("Evidence offered at summary judgment must be admissible to the same extent as at trial, at least if the opposing party objects, except that testimony can be presented in the form of affidavits or transcripts of sworn testimony rather than in person.") (quotes omitted).

Further drilling down into the City's positions underscores why its Motion to Strike must largely be denied. For example, take its assertion that "paragraphs 2, 6, 7, 9, 10, 13, 14, 17, 21, 24, 29, 30, 31 (Parts A – T), 33, 34, 35, 36, 38, 39, and 40 of Plaintiff's SOF are in violation of Local Rule 56.1 as drastically exceeding the reasonable limits of length and content and organized in such a way that render the City's response impractical and unduly burdensome." (Dkt. 75 at 2). As noted, several of these statements do violate the rules and the Court declines to consider those aspects that are improper. *Supra* at 4-9. Yet the City's position is overstated. It cannot maintain, for example, that Jones' Statement of Fact paragraph 35(f) is "drastically exceeding the reasonable limits of length and content" and that responding to it would be "impractical and unduly burdensome" when it merely states: "Wernick nor anyone from Defendant did not interview Layla Green. Ex. 1 Wernick Affidavit." (Dkt. 66, ¶ 35(f)); (Dkt. 75 at 2). On top of this, the City contradicts its own claim because it in fact substantively responded to certain of Jones' statements—in one week—in its untimely Response attached to its Motion for Leave *Instanter*. (*See, e.g.*, Dkt. 85-1, ¶¶ 7, 10). The City's claim that a host of paragraphs warrant striking because they are "vague, conclusory, hearsay, and otherwise not supported by admissible evidence" is *itself* vague, conclusory, and unsupported. (Dkt. 75 at 3). The City fails to undertake any analysis to substantiate its position. Indeed, if Jones' statements are inadmissible hearsay, surely the City would have undertaken an analysis under Federal Rules of Evidence 401 or 801, et. seq. It did not. The City fails to even cite the Federal Rules of Evidence in its Motion.

The City moves to strike pages 10 through 13 of Jones' Opposition to the City's Motion for Summary Judgment based on the arguments (the Court rejected) above as well because the evidence underlying these pages is improper "legal opinion." (Dkt. 75 at 8-9). The City takes issue specifically with Jones' Statement of Fact paragraphs 31 and 35. (*Id.*) The City's position is

overstated and undersupported. Paragraphs 31 and 35 are broken up into subparts, all of which are supported by evidence. (Dkt. 66, ¶¶ 31, 35). The two lines the City challenges—where Jones calls Wernick's report "a sham, inaccurate and bias[ed]" and "out of the ordinary"—could potentially be classified as legal opinions. *See* Black's Law Dictionary, 1266 (10th ed. 2014) (defining "legal opinion" as an attorney's opinion of their understanding of the law as applied to fact). Even assuming they are legal opinions, that changes nothing. The Court is not considering anything inadmissible in Jones' Statement of Facts—legal opinions included. Moreover, each of these lines come from the introductory paragraphs, not any of the discrete subparts substantiated by evidence. (*See* Dkt. 66, ¶¶ 31, 35). The City failed to directly challenge any of the evidence Jones submitted. (*Id.*); (Dkt. 75 at 8-9).

The City's last argument is that the Court should strike Jones' declarations. (Dkt. 75 at 9-13); (Dkts. 63-4, 63-5).[6] Jones' Declaration (Dkt. 63-5) violates 28 U.S.C. § 1746. It is unsworn, lacks a full signature (in fact it confusingly states that Jones is the witness), and fails to contain the necessary language: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." (*Compare* 28 U.S.C. § 1746(2) *with* Dkt. 63-5). Jones does not object to the City's motion to strike Dkt. 63-5. (Dkt. 79 at 15). The Court grants the City's Motion to Strike solely as it relates to striking Dkt. 63-5.

As for Dkt. 63-4, the City asserts that it is "self-serving" and lacks evidentiary support. (Dkt. 75 at 10-13). The City identifies examples of these deficiencies. (*Id.*) It first calls out Jones' averment that she asserted her rights on January 17, 18, and 19, 2024. (Dkt. 63-4, ¶ 11).[7] The City

[6] Jones' exhibits are organized in an extraordinarily confusing fashion. For example, Dkt. 63-4 is Jones' fourth listed exhibit but is labeled Exhibit 13; and Dkt. 63-5 is Jones' fifth listed exhibit yet is labeled as both Exhibit 16 and Exhibit 3 (Exhibit 3 is the sixteenth listed exhibit whereas the third listed exhibit is Exhibit 7). For clarity, the Court will refer to each exhibit by their docket filing number.
[7] The City cites to ¶ 4, but that is incorrect; the averment at issue is from ¶ 11. (*See* Dkt. 75 at 11; Dkt. 63-4, ¶¶ 4, 8, 11).

claims that "Jones never made a discrimination or race-based claim to the City in January 2024." (Dkt. 75 at 11). The City's position is unfounded. The City admitted that Jones asserted her rights that she was being discriminated against on the basis of her race by January 17, 2026 (Dkt. 66, ¶¶ 14, 21, 22, 23) and indeed the City's own evidence supports that conclusion. (Dkt. 51-10 at 16:2-17:21) (Wernick admitting that Jones made her claim by January 17, 2026); (Dkt. 51-2 at 10) (Sacluti memorandum stating that "[d]uring the afternoon of January 17, 2024, Sarah and I talked . . . . I told her that her hostile work claim was noted and that I would inform Chief of her statement. Notification was subsequently made to Chief Stewart on January 17, 2024. Notification was made to the City of Evanston's Human Resources Department on January 19, 2024.").

## II. Discrimination

"The same legal standard applies to claims of racial discrimination under Title VII, Sections 1981 and 1983, and the IHRA." *Gamble v. Cnty. of Cook*, 106 F.4th 622, 625 (7th Cir. 2024); *Wilson v. AIM Specialty Health*, 176 F.4th 977, 983 (7th Cir. 2026); *Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021); *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020). Before the Court begins its assessment of Jones' discrimination claims, it must first address Jones' claims under Section 1981. Jones asserts violations of 42 U.S.C. § 1983 "arising from" violations of 42 U.S.C. § 1981 in Counts II and III. (Dkt. 15, ¶¶ 113-125) (capitalization removed). The scope of Jones' claims is opaque. Section "1983 remains the exclusive remedy for violations of § 1981 committed by state actors." *Campbell v. Forest Pres. Dist. of Cook Cnty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014). Indeed, "42 U.S.C. § 1981 . . . does not create a private right of action against state actors." *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (quotes omitted); *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989). To the extent Jones

seeks to bring her claims under Section 1981, the Court grants the City's Motion for Summary Judgment for Counts II and III. (Dkt. 55 at 15-16).

"Title VII prohibits employers' intentional discrimination based on race." *Wilson v. AIM Specialty Health*, 176 F.4th 977, 983 (7th Cir. 2026) (citing 42 U.S.C. § 2000e-2(a)(1)). Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), "the plaintiff has 'the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual.'" *Wilson*, 176 F.4th at 983 (quoting *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022)). Under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016), the Court must place "all evidence in 'a single pile' and evaluate it 'as a whole' to determine whether the employer would have taken the same action had the plaintiff had a different race or ethnicity, 'and everything else had remained the same.'" *Wilson*, 176 F.4th at 983 (quoting *Ortiz*, 834 F.3d at 764-66). "In this circuit, Title VII plaintiffs may choose to present their evidence under either of two frameworks." *Id.* (citing *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)).

The Court "may skip the *McDonnell Douglas* prima facie analysis if the employer raises the employee's performance as the reason for the adverse employment decision." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023); *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023). "In such a case, issues of satisfactory performance and pretext overlap, allowing [the Court] to proceed directly to pretext. . . . Pretext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision." *Id.* (cleaned up). The City presented its arguments primarily under *McDonnell* (Dkt. 55 at 4-8) and summarily concluded that the evidence also satisfies *Ortiz*. (*Id.* at 8). "Because [the

City] has raised [Jones'] performance as the reason for [her] termination," the Court "need not consider [Jones'] prima facie case under *McDonell Douglas* or conduct a separate analysis of the facts under the two frameworks." *Vichio*, 88 F.4th at 691.[8]

The City claims that it fired Jones because she engaged in favoritism, lacked interpersonal skills, treated staff poorly, and failed to train Shorty. (Dkt. 55 at 1); (Dkt. 75 at 29). It further claims that Jones engaged in misconduct and violated the City's rules. (*Id.*) Jones claims that every reason the City put forth justifying her firing is false or a pretext. (Dkt. 60 at 5-30). The Court addresses each of the bases for the City's firing and asks "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765; *Vichio*, 88 F.4th at 691; *Groves v. South Bend Cmty. Sch. Corp.*, 51 F.4th 766, 769-70 (7th Cir. 2022).

This case poses the somewhat unusual scenario where there is no genuine issue of material fact, but the moving party is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

---

[8] The Court notes that in her Response Jones only relies on *Ortiz* because the "*McDonnell Douglas* standard does not work because [Jones] is the only employee who has her job—supervisor of records department." (Dkt. 60 at 1). The City asserts in its Reply that "[i]n the absence of direct evidence, a Title VII retaliation claim is evaluated under the *McDonnell Douglas* framework[.]" (Dkt. 75 at 14) (citing *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007)). The City continues that "[h]ere, there is no direct evidence of retaliation and yet Jones entirely foregoes any attempt to refute [the] City's *McDonnell Douglas* analysis." (*Id.*) Setting aside that the City's position is unfounded *Ortiz*, 834 F.3d at 765 (holding that courts "must stop separating 'direct' from 'indirect' evidence"), the parties' competing positions exemplify the "significant confusion" litigants face when attempting to apply the *McDonnell Douglas* framework at summary judgment. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 314-326 (2025) (Thomas, J., concurring) (explaining why "the *McDonnell Douglas* framework is incompatible with the summary-judgment standard set forth in Federal Rule of Civil Procedure 56"). Another problem is that, because of these two standards, the parties spend much of their time talking past each other. For example, it is difficult for the Court to trace Jones' arguments onto the City's assertions and vice versa. (*Compare* Dkt. 60 *with* Dkt. 55). Jones presented a collection of substantive reasons why the Court should deny the City's Motion but does not expressly tie those reasons to the City's individual arguments because, among other reasons, Jones relies on the *Ortiz* standard. (Dkt. 60). Moreover, the City's Motion focuses on legal issues while summarily incorporating its entire statement of facts by reference with scant discussion. (Dkt. 55 at 2). These issues force the Court to perform the organizational and analytical work of mapping the City's Motion onto Jones' Opposition in what amounts to little more than a massive data dump for the Court to figure out. These issues are confounded by the parties' Local Rule violations.

There is no genuine issue of material fact whether Jones engaged in favoritism. The City admitted that Jones did not show favoritism and that it has no evidence to support its claim. (Dkt. 66, ¶¶ 31(g), 35(g)). Even absent the City's admission, the support for the City's claim that Jones showed Green favoritism is non-existent. Wernick proclaims in his memorandum that Jones "blatantly shows preference for Clerk L. Green over the Records employees." (Dkt. 51-14 at 18). This is apparently based on statements Shorty made to Sacluti that "Jones spends a lot of time with Clerk Green, even alone in her office, and that those opportunities are not afforded to other Records staff." (Dkt. 51-14 at 3). Shorty's memorandum complaining about Jones—which the City instructed Shorty to write and file—notes that Jones "would take more time training our part-time employee instead of the full-time employees." (Dkt. 51-16 at 3).

By definition, "favoritism" is the "invidious" "[p]reference or selection . . . based on factors other than merit." Black's Law Dictionary, 725 (10th ed. 2014). There is ample evidence in the record that Green received certain work and spent varying time with Jones because of merit—Green was an eager, hardworking, and excellent employee. For example, Delarosa sung her praises for Green, and, when asked "How would you describe Ms. Green's work ethic?" she testified: "Oh, awesome. I could give her anything." (Dkt. 51-5 at 26:24-27:2). As for the time with Jones, Delarosa testified that the reason Jones spent more time working with Green than other employees was because they were both working on "tedious," time-consuming expungements. (*Id.* at 28:1-20).[9] Delarosa also testified that Jones did not show favoritism but treated everyone "the same." (*Id.* at 28:21-29:5) (Q: "Did Ms. Jones show favoritism to employees or did she treat them somewhat equally? . . . In your personal knowledge, did Ms. Jones treat the employees

[9] Delarosa explained that expungements are "a lot of work." (Dkt. 51-5 at 28:14-20).

[similarly?]" A: "The same.");[10] (Dkt. 63-3 at 2-3) (Rivera testifying that she had no issues with Jones and that she feels she works in a healthy workplace). Whereas it is undisputed that Tarshanda Shorty was difficult to work with. Delarosa testified that if "Tarshanda did not agree" with you "she would shut down and not communicate"; she further testified that Shorty did this "many times" and called it "not healthy." (*Id.* at 14:2-11). Delarosa called Shorty an "average" employee who makes repeated mistakes that no one else in the Department makes—including the same ones Jones brought to Sacluti's attention (i.e., creating duplicate records in evidence.com). (*Id.*, at 17:17-19:15); (Dkt. 63-2) (Jones' memorandum detailing Shorty's violations for being incompetent by continuing to create duplicate records in evidence.com).

In the same vein as apparently showing favoritism, another basis for the City firing Jones was her failure to give Shorty training. (Dkt. 51, ¶¶ 23, 37, 38, 49, 60); (Dkt. 51-2); (Dkt. 51-14); (Dkt. 75 at 26-27). There is no issue of material fact here because the City admitted that Shorty received training and refused to accept feedback or learn from her mistakes. (Dkt. 66, ¶¶ 8, 9, 10, 11, 12, 13, 17). Admissions aside, the City's backing for its position is flimsy. It relies solely on Shorty's statements, but Shorty repeatedly contradicts herself—repeatedly admitting that she received training while complaining she did not receive training. (*Compare* Dkt. 51-16 at 1-3) (admitting that she has worked with "everyone in the department to be trained" while complaining that "I feel that supervisor Jones . . . does not want to train me") *with* Dkt. 51-6 at 14:7-9 (Shorty testifying when asked: Q: "What training did you receive when you first began working?" A: "None"); *id.*, at 20:8-22 (admitting to receiving training for evidence.com).[11] It is further undisputed that Shorty was not receptive to training or feedback and was difficult to communicate

[10] Delarosa had worked with Jones for over 19 years and was on the eve of retirement at the time of the alleged incidents. (Dkt. 66, ¶ 13).

[11] This is a common trend among Shorty's statements; in both her deposition and complaint, she repeatedly contradicts herself and otherwise presents a largely incoherent series of events.

with. Delarosa testified that she did not want to work with Shorty because she did not want to "deal with" her. (Dkt. 51-5 at 36:11-17). Shorty was so difficult that Delarosa turned down a promotion just to avoid having to spend more time with her, testifying that she did not want the job "[b]ecause of the atmosphere." (*Id.* at 12:13-14). She reasoned that, "[i]f I can't approach an individual with corrections" and if I "know there's going to be tension, . . . I don't want the job." (*Id.*, at 12:15-18).[12] Delarosa flat out explained that Shorty "doesn't accept feedback." (*Id.* at 36:5-7). And when asked: "what individual would you have tension with that you wouldn't approach?" She responded: "Honestly, Tarshanda." (*Id.* at 12:19-21). Delarosa further testified that Tarshanda Shorty had "a communication problem." (*Id.* at 36:1-4). She also testified that Shorty had problems with Maribel Rivera, the only other full-time employee in records. (*Id.* at 50:10-16); (*see also id.* at 34:6-43:1) (Delarosa testifying that she reported to Wernick the issues she was having with Shorty and told him "the problem hasn't changed").

A corollary of Jones' failure to train Shorty was Jones' apparent lack of interpersonal skills and ongoing performance issues leading up to her firing. (Dkt. 55 at 10-11); (*see, e.g.*, Dkt. 51, ¶¶ 20-36). The City claims that Jones was "warned about her bullylike behavior towards the records clerks" and "repeatedly demonstrated significant interpersonal and management deficiencies, including difficulty delegating, poor communication, and inability to build a cohesive team." (Dkt. 51, ¶¶ 20, 27). The City's position has no support. When Sacluti gave Jones her performance review on December 26, 2023—just weeks before her sudden firing—Sacluti stated that "Supervisor Jones' unit (Records Bureau) is free of harassment, abusive behavior, and bullying"; Jones "exhibits a culturally sensitive attitude and demeanor." (Dkt. 51-3 at 6). Moreover, Delarosa

[12] Delarosa went so far as to do Shorty's work for her—and to fix her mistakes—just to avoid dealing with Shorty. (Dkt. 51-5 at 17:20-22) (Q: "Does [Shorty] make mistakes?" A: "She does and I fix them. Personally, I will not ask her to fix them.").

testified that Jones "did very well" as a supervisor. (Dkt. 51-5 at 8:1-4). Delarosa's testimony is corroborated by Jones' performance evaluation where Sacluti gave her a "Highly Satisfactory" rating and praised her as "extremely dependable and a true asset to this police department." (Dkt. 51-3 at 7, 8); (Dkt. 63-15) (Jones' performance valuation from 2022-2023 was virtually perfect, scoring a 4.94/5.00). The City also admitted that both Sacluti and Chief Stewart praised Jones' performance—just one week before the City placed Jones on leave for "performance issues" and shortly before firing her. (Dkt. 66, ¶ 3).

The other bases for Jones' firing come from the City's claim that Jones engaged in misconduct and rule breaking. After the City instructed Shorty to file a complaint against Jones, the City investigated Jones and identified a litany of rules Jones apparently violated. (Dkt. 51, ¶¶ 45-57); (Dkt. 51-14 at 19-21); (*see also* Dkt. 66, ¶¶ 4, 5). These violations include disseminating City information without permission (*id.*, ¶¶ 50, 56), misusing the LEADS system (*id.*, ¶ 51), using her work email, computer, and phone for personal reasons (*id.*, ¶ 52), attending and organizing a Gangster Disciples reunion picnic (*id.*, ¶ 55), and lying to Wernick about these infractions when he interrogated her. (*Id.*, ¶ 53).

Jones sent about thirty emails over several years—all before this dispute arose—where she shared certain information (e.g., an arrest report, a work headshot photo of Police Chief Demetrius Cook, a homicide list, and other mundane City forms, templates, and policies) to former Evanston Deputy Chief (and then Current Richton Park Police Chief) Demetrius Cook. (*See* Dkt. 51-12). Despite listing sharing information as one of the reasons Wernick recommended firing Jones in his memorandum (Dkt. 51-14 at 11-12) (calling Jones' conduct "a direct violation of department policy"), Wernick conceded that there was in fact no such policy. (Dkt. 51-10 at Tr. 27:19-23). When asked "Is there a specific policy?" Wernick stated, "No." (*Id.*); (*see also id.* at Tr. 25:11-

28:18) (Wernick admitted that he could identify no rule that Jones violated). Delarosa testified that Jones' sharing of information to other police departments was routine and permissible: Q: "So if another . . . city's police chief called and wanted information, you would give that out?" A: "Correct." (Dkt. 51-5 at Tr. 32:1-8). She further testified that this practice was commonplace: "I have had other police departments call me and asked, Chief, send me record – asked for records, and I fill it." (*Id.*, Tr. 31:14-34:1); (*see also* Dkt. 51-6 at Tr. 32:9-21). The City further admitted that there was no policy and that Delarosa engaged in the same conduct as Jones. (Dkt. 66, ¶¶ 31(n), 31(o), 34). The City's reliance on Jones' apparent misuse of the LEADs system fails for similar reasons. The City claims Jones used it for personal reasons by running her husband through the system. (Dkt. 51, ¶¶ 51, 54); (Dkt. 51-11 at 2). Yet the City admitted that it identified no policy that Jones violated, that Jones was using the LEADs system properly—to create training materials—and that it was aware of Jones' use. (Dkt. 66, ¶¶ 31(r), (s)).[13]

The City claims that Jones' improper personal use of her work email, phone, and computer warranted termination. (Dkt. 51, ¶ 52); (Dkt. 55 at 11). These infractions include things such as using the GPS app on her phone (e.g., Maps), chatting with a coworker, and sending a few email inquiries regarding buying a car. (*Id.*) Taking one step back, recall that Jones' allegations solely concern the City firing her after she sought to discipline Shorty per City procedures. (Dkt. 15). So despite the City hiring Shorty on February 7, 2023 (Dkt. 75 at 26) and the dispute coming to a head in January 2024, the City nevertheless conceded that they conducted an extraordinarily invasive forensic search of Jones' phone, email, and computer dating back to 2018 on issues wholly irrelevant to their initial basis for investigating Jones. (Dkt. 66, ¶¶ 31(e), 39, 40); (Dkt. 51-10 at Tr. 28:22-29:11) (Wernick admitting an investigation of this magnitude was "not done

[13] The City had in fact instructed Jones to create additional training materials. (Dkt. 51-2 at 7).

regularly," and that he had only ever conducted a full search of an employee's email not more than three times in his career). The City further admitted that Jones' use of her phone, email, and computer was commensurate with City norms and other City employees' usage. (*Id.*)

Another basis the City identified as a reason for firing Jones was her attendance at a picnic in which active and former Gangster Disciple members were apparently present. (Dkt. 51, ¶ 55); (Dkt. 55 at 11). The City asserts that Jones' "husband is a member of the Gangster Disciples" and that Jones was an "organizer" of the event. (*Id.*).[14] To be sure the City does have a policy prohibiting "fraternizing" with known convicted felons, but that rule excepts family and those authorized by the City. (*See* Dkt. 51 at 17). The City presented no evidence that anyone at the picnic was a known convicted felon; even assuming some were, Jones' husband is family and it is undisputed that the City was aware of Jones' involvement, present at the scene, permitted her involvement, and took no action for her involvement—until after she made her claim against the City several years later. (Dkt. 66, ¶ 33).

The City's last primary basis for firing Jones was because of her apparent lack of candor when Wernick interrogated her. (Dkt. 51, ¶¶ 45, 53); (Dkt. 55 at 13). The City asserts that "Jones violated a large number of rules and policies and directly lied when confronted with the information." (*Id.*, ¶ 53). The factual basis for the City's position comes from Wernick's report, which is based on his interrogation of Jones. (Dkt. 51-14). In his report, Wernick claimed that Jones lied and lacked candor during her interrogation, stating, for example, that "Jones lied . . . by denying using her COE email, COE computer, and COE cell phone for real estate deals and

[14] Wernick avers that supervisors who arrived on the scene of the picnic "advised" that Jones appeared to be an "organizer." (Dkt. 51-11 at 2). Thus, whether Jones was an organizer is hearsay; however, Jones failed to object on this basis and thus the objection is waived. (Dkt. 62, ¶ 55); *see Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 563 (7th Cir. 2002); *see also Taylor v. Nw. Mem'l Hosp.*, 521 F. Supp. 3d 714, 718 (N.D. Ill. 2021) ("Where a party fails to make an objection to the admissibility of evidence, the objection is deemed waived for purposes of the motion for summary judgment.") (cleaned up) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Rodriguez*, 2021 WL 131419, at *1 (N.D. Ill. Jan. 14, 2021)).

transactions." (*Id.* at 16); (*see also id.* at 13) ("Jones lied about utilizing LEADS to check her husband, Christopher Jones, which was memorialized in the LEADS offline search"). The City concedes, however, that Jones did not lie, but rather Wernick ambushed her with outcome-driven questions about irrelevant events that occurred years prior. (Dkt. 66, ¶¶ 30, 31(d), 31(r), 36). The Court has reviewed all of the evidence and finds that Wernick designed the interrogation process to set Jones up for failure and to trick her into inadvertently admitting to wrongdoing. Wernick dug through nearly a decades' worth of Jones' texts, calls, and emails to find any instance of wrongdoing—wholly unrelated to the actual issue at hand—and then asked Jones about one off events from years prior—that most would forget or view as insignificant—and then held those answers against her. The City concedes that this is what occurred. (Dkt. 66, ¶¶ 35(i)); (*see also id.*, ¶¶ 30, 31(d), (e), (h), (i), (l), (m), (n), (r), 32, 35(d), 36)).

Even a cursory review of the City's policies shows that the City flouted its own rules during its investigation and ultimate firing of Jones. Consider Section 1010.6.2(e) which requires the City to notify Jones in writing of the nature of the investigation. (Dkt. 63-16 at 16). That never happened. In so doing the City violated not just its own policy but Illinois law. Under 50 ILCS 725/3.2, "No officer shall be subjected to interrogation without first being informed in writing of the nature of the investigation. The information shall be sufficient as to reasonably apprise the officer of the nature of the investigation." The City also violated 50 ILCS 725/3.8(a) because Wernick began the interrogation without "first" advising Jones "in writing that admissions made in the course of the interrogation may be used as evidence of misconduct or as the basis for charges seeking suspension, removal, or discharge" and without "first" advising Jones "in writing that . . . she has the right to counsel of . . . her choosing who may be present to advise him or her at any

stage of any interrogation." The City concedes that it violated at least fourteen provisions from its own policy as well as Illinois law. (Dkt. 66, ¶ 5); (*see also id.*, ¶ 4).[15]

At bottom, there is no issue of material fact. The City has marshalled no evidence to support its position that entry of summary judgment against Jones is warranted. None of the City's arguments carry the day as a matter of law. The Court turns to those now. The City first contends that Jones' claims fail under *McDonnell Douglas* because she cannot show "a prima facie case of discrimination because she cannot demonstrate that she was complying with the City's rules in connection with her employment, or that similarly situated individuals were treated more favorably." (Dkt. 55 at 4). This fails for the reasons above. *Supra* at 1-21.

The City's next point is that Jones failed to identify "a similarly situated employee to whom policies or treatment was applied differently." (Dkt. 55 at 6). This is not relevant and instead advocates for the inflexibility the Supreme Court has cautioned against. "Indeed, the Court in *McDonnell Douglas* warned against an unduly rigid approach to Title VII cases." *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 845 (7th Cir. 2007). "In a termination case, for example, an inflexible rule requiring plaintiff to point to a similarly situated comparator would automatically doom a suit brought by, for example, any employee who is the sole occupant of a particular job class at her employer." *Id.* at 846. Jones was the only supervisor in the records department. (Dkt. 51, ¶¶ 1, 8; Dkt. 62, ¶¶ 1, 8). She need only show that "members of the comparison group are

---

[15] In addition, the City also violated Section 1004.3 because it demoted Jones shortly after she sought to discipline Shorty. (Dkt. 63-16 at 10). Wernick and Sacluti violated Section 1004.5 because, for example, they failed to receive Jones' complaints "in a fair and impartial manner." (*Id.* at 11). Wernick violated Section 1004.8 because he destroyed his investigative documents. (*Id.* at 12); (Dkt. 66, ¶ 5). The City violated Section 1010.5 by failing to document Jones' complaints. (*Id.* at 14). The City likewise violated Section 1010.7 with its extreme search of Jones' devices and accounts. (*Id.* at 19). Chief Stewart and the City violated Sections 1010.10.2 and 1010.11 because Jones was given no notice nor opportunity to respond to her accusations. (*Id.* at 21-22). The City also violated Section 1010.13—not to mention a series of Illinois laws—because it afforded Jones no appellate rights. (*Id.* at 23). The City's decision to fire Jones violated Section 1010.17 because the City failed to first take less severe steps prior to termination. (*Id.* at 24-25).

sufficiently comparable to her to suggest that she was singled out for worse treatment." *Crawford v. Ind. Harbor Belt R.R.*, 461 F.3d 844, 846 (7th Cir. 2006). Jones shows just that. With no exact match, Jones sufficiently compares herself to Shorty. Shorty worked with Jones in the same group, both complained to upper management (Sacluti), and Jones contends that she was discriminated against because she was the only white woman in the department. (Dkts. 60, 66). Jones, following the City's procedures, raised Shorty's shortcomings with Sacluti, but Sacluti and the City took no action—failing to investigate *any* of Jones' complaints—in violation of City policy. (*Id.* at 23-24); (Dkt. 66, ¶¶ 4-12, 14, 20, 25-27, 31(a), 31(f), 35(j), 36). The remainder of the City's arguments—that Shorty is not similarly situated to Jones—fall into the same impermissible trap. (Dkt. 55 at 6-8). The City cites no evidence in support but vaguely references certain allegations from Jones' Complaint. (*Id.*) The City's position is unfounded. *Pantoja*, 495 F.3d at 845.

The City's final argument is that Jones' claims fail under the *Ortiz* test. (Dkt. 55 at 8). This argument is undeveloped and conclusory. (*Id.*) Apart from listing a part of the standard, the City provides no analysis, support, or law to support its position. (*Id.*) This fails. "Undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Derek Khanna v. Katelynn Banks et al.*, 2026 WL 2836748, at *9 n.7 (N.D. Ill. Sept. 22, 2026) (brackets omitted) (quoting *Jackson v. City of Madison*, 176 F.4th 1005, 1016 (7th Cir. 2026)). The Court has scrutinized the mass of evidence and finds that Jones' race was a "motivating factor" behind the City's adverse employment practices against her, and it further finds that this is true "even though other factors" may have "also motivated the practice[s.]" 42 U.S.C. § 2000e–2(m); *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310 (2025) ("[T]he standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group.").

## III. Retaliation

The City of Evanston moves for summary judgment on Jones' retaliation claims: Section 1983 Race Retaliation, Title VII Retaliation, and the IHRA Race Retaliation. (Dkt. 55 at 8-11). The City asserts that, while Jones "complained of a hostile environment, she never identified any protected status related to them." (*Id.* at 9). Even if Jones identified a protected status, the City maintains that "Jones' complaints in January were not made until she was stripped of her supervisory powers and was under investigation," so there was no causal connection (*Id.* at 10).

Jones counters that only after making a "discrimination complaint did she suddenly become a 'problem.'" (Dkt. 60 at 28). Jones asserts that "Chief Stewart knew that Plaintiff complained of a hostile work environment on or about January 18, 2024, and was enraged by this fact." (*Id.* at 2). Jones contends that she "made a complaint to at least three individuals which included her supervisor, DC Sacluti, Defendant's lawyer who is employed by Defendant, Alexandra Ruggie and Commander Ken Carter." (*Id.*) She further explains that the "alleged counseling by Sacluti and the claims of Plaintiff's 'inferior performance' only appeared after Plaintiff filed a discrimination complaint." (*Id.* at 8). Jones points to the temporal proximity, as she "complained of discrimination and hostile work environment" and "was suspended a day later"—"after Stewart learned of her complaint." (*Id*. at 4).

"To establish a retaliation claim, [Jones] must show that '(1) [she] engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the two.'" *Golat v. Skwierawski*, 184 F.4th 938, 956 (7th Cir. 2026) (quoting *Estate of Harris v. City of Milwaukee*, 141 F.4th 858, 869 (7th Cir. 2025)); *Ismail v. Steiner*,___F.4th___, 2026 WL 2662353, at *4 (7th Cir. Sept. 10, 2026). "Because the analysis for a retaliation claim under Title VII tracks the analyses for retaliation claims under section 1981, section 1983, and the

IHRA, [the Court] need not separately discuss those statutes." *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 n.2 (7th Cir. 2021) (citing *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (section 1981), *Nicholson v. City of Peoria*, 860 F.3d 520, 523 (7th Cir. 2017) (section 1983), and *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382-83 (7th Cir. 2016) (IHRA)).

It is undisputed that Jones engaged in a statutorily protected activity and suffered an adverse employment action. (Dkt. 66, ¶¶ 1, 15, 18, 21, 24, 34). The City nevertheless maintains that Jones' complaints in January 2024 were not protected activity because Jones did not claim that she was being discriminated against on the basis of her race. (Dkt. 55 at 9-10). It asserts that this did not occur until Jones sent an email on February 22, 2024. (*Id.*); (Dkt. 63-1). To be sure "[w]ithout a link between the [City's] actions and [Jones'] protected class" generic complaints alone "cannot constitute protected activity under Title VII." *Giese v. City of Kankakee*, 71 F.4th 582, 591 (7th Cir. 2023) ("Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class.") (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). There is no evidence supporting the City's position. The City has conceded that Jones complained that she was being discriminated against on the basis of her race on January 17, 18, and 19, 2024. *Supra* at 12; (Dkt. 66, ¶ 21); (Dkt. 63-4, ¶¶ 2, 8, 11, 15, 21, 23). The Court therefore proceeds to causation.[16]

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). "The 'key question' on causation is 'whether a reasonable juror could conclude that there

[16] The City's position is also irrelevant and conflates the significance of the City placing Jones on leave with firing her; even accepting the City's position as true, it does not change the fact that the City fired Jones shortly after Jones filed a complaint on the basis of her race.

was a causal link between the protected activity or status and the adverse action.'" *Pratt v. Wis. Aluminum Foundry*, 183 F.4th 541, 559 (7th Cir. 2026) (quoting *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019)). "When a plaintiff brings a Title VII retaliation claim, [s]he can show causation by presenting direct evidence that [her] complaints . . . were a substantial or motivating factor in [her] employer's decisions to take the adverse action against [her]." *Ismail*, 2026 WL 2662353, at *4 (cleaned up). "Additionally, [s]he can offer circumstantial evidence that could lead to an inference of but-for causation, including: (1) suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn; (2) evidence that similarly situated employees were treated differently; and (3) facts indicating that the employer offered a pretextual reason for an adverse employment action." *Id.* (cleaned up).

The evidence that Jones' complaints were a "substantial or motivating factor" in the City's decision to retaliate against her is overwhelming. The direct evidence of retaliation stems from the City's admitted policy of not disciplining Black employees. (Dkt. 66, ¶¶ 21, 22, 23, 35(a)); (Dkt. 63-4, ¶¶ 4, 11); (Dkt. 51-2 at 6); (Dkt. 51-14 at 5); (Dkt. 51-15 at 2). The City enacted this policy because of recent race discrimination lawsuits it faced. (*Id.*) Or, as Wernick explained, the City emphasized "the importance of not showing favoritism and always taking into account that the City of Evanston (COE) had just dealt with complaints about individuals with protected classes feeling they were not being treated fairly." (Dkt. 51-14 at 5); (Dkt. 51-4, at Tr. 109:12-111:16); (*see also* Dkt. 51-15 at 2) (Memorandum from Sergeant Carter to Sacluti and Commander Pillars: "Jones stated that Deputy Chief Sacluti is not going to do anything to resolve the matter because Deputy Chief Sacluti is worried about the optics. Mrs. Jones stated that Deputy Chief Sacluti will

not address Mrs. Shorty in light of a recent lawsuit filed by a group of African American employees.").

The timing here is certainly "suspicious." *Ismail*, 2026 WL 2662353, at *4. Jones worked for the City as an exemplar employee with a clean record for nearly twenty years. (Dkt. 24, ¶ 9); (Dkt. 63-4, ¶¶ 2, 8). Yet the ***day*** after Jones complained, the City demoted her and then suspended her the very next day. (*Id.*); (Dkt. 63-4, ¶¶ 2, 8, 11, 15, 21, 23). The timing here is remarkably suspect especially given that just 10 days prior Jones received another exemplary performance review of "Highly Satisfactory" from Sacluti and Stewart where they praised her as "extremely dedicated" and "always willing to assist others." (Dkt. 51-3 at 4-5, 7-8). Suspicious timing can establish an inference of retaliation "[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)).

Evidence concerning similarly situated employees being treated differently is subject to the fact that Jones was the only supervisor and white person in the records department. Likely the best comparator is Shorty because both were ostensibly subject to the City's rules, yet when both complained to their superior—Sacluti—the City's policy suddenly had no effect on Shorty but was singularly and selectively (mis)applied to Jones. *Infra* at 21-22, n.15 (discussing City's policy violations). Perhaps the clearest example of discrimination is how the City responded to Jones' and Shorty's complaints. Jones raised Shorty's misconduct, bad attitude, and incompetence with the City repeatedly over the course of months and went to great lengths to remedy the situation. (Dkts. 63-1, 63-2, 63-4); (Dkt. 66, ¶¶ 6, 7, 8, 10, 12, 15, 17, 20, 22, 25, 27, 31(i), 35(c), 35(g), 37); (Dkt. 51-17 at 7-9); (Dkt. 63-12 at 20, 54). When Jones finally felt that discipline was necessary

and presented her complaint to the City—with evidence showing Shorty's continued mistakes and refusal to learn from them—Sacluti did what she had been doing all along: nothing. (Dkts. 63-1, 63-2, 63-4, 63-8 at 10); (Dkt. 66, ¶ 17). Sacluti instead brushed off the concerns and took no action. Indeed, the City never looked into Shorty's conduct—all of Jones' complaints went unaddressed. (Dkt. 51-7 at Tr. 29:24-42:6); (Dkt. 51-10 at Tr. 14:14-21) (Q: "Do you know if anybody investigated this complaint of Sarah Jones? Wernick admitting: "I do not. Nobody investigated it as far as I'm concerned when I was there."); (Dkt. 66, ¶¶ 4-12, 14, 20, 25-27, 31(a), 31(f), 35(j), 36). Whereas, based on a few vague, uncorroborated, and contradictory statements Shorty made, the City instructed Shorty to file a complaint against Jones and used that complaint as the predicate for firing Jones. (*See* Dkt. 51-16).

The record reeks of pretext. The City's primary basis for firing Shorty—the issue that kickstarted this entire dispute—was Jones' apparent refusal or inability to train Shorty. Yet, fatal to the City's position is that, after it fired Jones, Shorty *still* received no training. (Dkt. 66, ¶ 11); (Dkt. 51-7 at Tr. 26:2-5) (Q: "What training has Tarshanda Shorty received since Sarah Jones was placed on administrative leave?" Sacluti—Shorty's supervisor after Jones was fired—conceded: "I don't know that answer."). If the issue with Jones was her failing to train Shorty, why did Shorty receive no training after Jones was fired? The City has no answer for that. (*Id.*) The list goes on. First, it is undisputed that the City never investigated Shorty's training, attitude, or Jones' complaints against Shorty. (Dkt. 60 at 6); (Dkt. 66, ¶¶ 4-12, 14, 20, 25-27, 31(a), 31(f), 35(j), 36). Second, it is undisputed that the City "never examined whether [Jones] was subjected to a hostile work environment or treated differently because of her race." (*Id.* at 7; *see also id.* at 7-9); (Dkt. 66, ¶¶ 31, 35). Third, it is undisputed that Wernick's investigation was outcome driven. (*Id.* at 10-14); (Dkt. 66, ¶¶ 31, 35). Indeed, on this front, even a cursory examination of his interviews showed

he sought outcome driven questions, avoided damaging questions, failed to interview key and neutral witnesses and, when he did, his questions were superficial and avoided topics damaging to the City's case. (Dkt. 66, ¶ 36); (Dkts. 63-3, 63-12, 63-13). Fourth, it is undisputed that the City repeatedly violated its own policies and procedures. (Dkt. 60 at 14-16); (Dkt. 66, ¶¶ 4, 5); *supra* at 21-22, n.15. Fifth, it is undisputed that the City conducted an unprecedented investigation into Jones far outside the scope of alleged incident. (*Id.* at 16-23); (Dkt. 66, ¶¶ 31(e), 35(a), 35(i)); *supra* at 18-21. Sixth, it is undisputed that the City chose to not "write up a document for Shorty like it did for Sarah Jones" and failed to "investigate Sacluti or Stewart relating to Sarah Jones['] Complaints." (Dkt. 66, ¶ 26); (*see also id.*, ¶¶ 4-12, 14, 20, 25-27, 31(a), 31(f), 35(j), 36); (Dkt. 60 at 23-24). Seventh, it is undisputed that the City selectively applied its policies in a way favorably to Shorty and unfavorably to Jones. (Dkt. 60 at 23-24); (Dkt. 66, ¶¶ 4, 5, 25, 26, 31(a), 36); *supra* at 21-22, n.15. Lastly, as discussed above, it is undisputed that there is no evidence Jones showed Green favoritism (*id.* at 24-27); (Dkt. 66, ¶¶ 1, 2, 3, 7, 9, 20, 31(l), 31(g), 35(f), 35(g), 36, 38) or engaged in any of the conduct the City said she did as the basis for firing her. *Supra* at 12-23.

There are additional "bits and pieces" of circumstantial evidence supporting a finding of retaliation on the basis of race. *Ismail*, 2026 WL 2662353, at *4 (cleaned up). Shorty is family friends with and connected to Chief Stewart—showing favoritism. (Dkt. 63-4); (Dkt. 51-17 at 6); (Dkt. 66, ¶ 6). Jones had exemplar ratings for years with no disciplinary issues whatsoever until Shorty, an employee on probation who was at the City for less than a year with connections to Chief Stewart, was hired. (Dkt. 63-15); (Dkt. 51-7 at Tr. 23:8-18); (Dkt. 51-3); (Dkt. 66, ¶ 6). The City possessed a diversity quota. (Dkt. 63-14). Wernick's report was untruthful, contradicted, and omitted all mitigating evidence in favor of Jones. (Dkt. 51-14). And the City's conduct created a "chilling effect" on its employees. Even though Delarosa testified that she believed that Jones

should not have been fired (Dkt. 51-5 at Tr. 43:6-8), she testified that she would not file a claim or come forward against the City out of fear of retaliation. (Dkt. 66, ¶ 42).

Lastly, the City contends that Jones waived any argument concerning her claims under Section 1983. (Dkt. 75 at 34-36). The City applies the wrong standard. *Gamble*, 106 F.4th at 625 ("The same legal standard applies to claims of racial discrimination under Title VII, Sections 1981 and 1983, and the IHRA."); *Miller*, 20 F.4th at 1155 n.2. At any rate, the evidence amply supports Jones' theory that a person with final policymaking authority—i.e., Chief of Police Stewart, Office of Professional Standards Commander Wernick, and Deputy Chief Sacluti—caused Jones' constitutional injuries. *Supra* at 1-29; (*see also* Dkt. 63-16 at 15) (Section 1010.6 states that the "supervisor in charge of the Office of Professional Standards . . . [e]xercises authority on behalf of the Chief of Police in handling these investigations").

**Conclusion**

The Court denies the City's Motion for Summary Judgment in full except as to Counts II and III to the extent Jones seeks to bring her claims under Section 1981. (Dkt. 55). The Court denies Jones' Motion for Limited Admission (Dkt. 78) and the City's Motion For Leave To File Response To Plaintiff's Rule 56.1(B)(3) Statement Of Facts *Instanter*. (Dkt. 85).

Virginia M. Kendall
United States District Judge

Date: September 28, 2026